IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION

13-CV-62587-WPD

MARIE ANDRE,

Plaintiff,

vs.

ARMOR CORRECTIONAL HEALTH SERVICES, INC.,

Defendant.
_________________________________/

VOLUME 1

DEPOSITION OF:

MARIE ANDRE

Examination of a Witness, beginning at 10:05 A.M. and adjourning at 5:31 P.M. on Thursday, May 8, 2014 taken by the Defendant at 405 N. Avenue of the Arts; Fort Lauderdale, Florida, before Roberta Turner, RPR, FPR, CLR, CCR (GA), Certified Court Reporter.

```
 1   APPEARANCES:

 2          DANIEL PALUGYAL, ESQ.
            Remer & Georges-Pierre, PLLC
 3          44 W. Flagler Street, Suite 2200
            Miami, Florida  33130
 4
                 On behalf of the Plaintiff;
 5

 6          DOUGLAS T. NOAH, ESQ.
            Dean, Ringers, Morgan & Lawton, P.A.
 7          201 E. Pine Street, Suite 1200
            Orlando, Florida  32801
 8

 9               On behalf of the Defendants.

10

11   ALSO PRESENT:  CARMEN CARVAJAL, REPRESENTATIVE
                     Armor Correctional Health Services.
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                          I N D E X

2     WITNESS
      MARIE ANDRE

3

4         Direct Examination by Mr. Noah              5

5

6

      ERRATA SHEET                                   286
7
      CERTIFICATE OF OATH                            287
8
      CERTIFICATE OF REPORTER                        288
9
      SIGNATURE LETTER                               289
10

11               DEFENDANT'S EXHIBITS MARKED

12    NO.  1 -- License Verification                 12

13    NO.  2 -- Employment Application               24

14    NO.  3 -- Personnel Action Form                33

15    NO.  4 -- Employee Handbook Receipt
                 Acknowledgement Form                45
16
      NO.  5 -- Table of Contents                    47
17
      NO.  6 -- Job Summary                         102
18
      NO.  7 -- Personnel Action Form               103
19
      NO.  8 -- Performance Management and
20               Conduct Corrective Action Plan     116

21    NO.  9 -- Progress Note                       129

22    NO. 10 -- Typewritten Document DTD 08-11-11   141

23    NO. 11 -- E-Mail DTD 09-08-11                 154

24    NO. 12 -- Interview Notes                     160

25    NO. 13 -- Interview Notes                     177

1               I N D E X   C O N T I N U E D

2    NO. 14 -- Typewritten Document DTD 10-19-11    184

3    NO. 15 -- Performance Management and Conduct
                Corrective Action Plan              190
4
     NO. 16 -- E-Mail DTD 03-08-12                  220
5
     NO. 17 -- Performance Coaching                 227
6
     NO. 18 -- Performance Management and Conduct
7               Corrective Plan                     228

8    NO. 19 -- E-Mail DTD 04-27-12                  243

9    NO. 20 -- Letter DTD 04-28-12                  245

10   NO. 21 -- Follow up to Performance Management  250

11   NO. 22 -- Further Action to be Taken Form      250

12   NO. 23 -- E-Mail DTD 07-13-12                  250

13   NO. 24 -- Follow up to Performance Management  259

14   NO. 25 -- E-Mail DTD 08-08-12                  268

15   NO. 26 -- Performance Management and Conduct
                Corrective Plan                     273
16

17

18

19

20

21

22

23

24

25

```
 1            MORNING SESSION  MAY 8, 2014
 2                   Volume 1 of 2
 3            THE WITNESS:  Yes, ma'am.
 4                     MARIE ANDRE
 5       Called as a witness having been first duly
 6       sworn, was examined and deposed as follows:
 7                  DIRECT EXAMINATION
 8  BY MR. NOAH:
 9       Q    Can you begin by telling her your full
10  name, please.
11       A    Marie Wilda Andre.  W-I-L-D-A.
12       Q    And have you ever been deposed in a
13  situation like this before?
14       A    Yes.
15       Q    And what was the circumstance that led you
16  to be deposed in the past, or circumstances if more
17  than one?
18       A    Actually, I was working for a agency for
19  about three months and I was never paid, so I had
20  to take that individual to court to get my money
21  paid to me.
22       Q    Okay.  So like a temp agency?
23       A    Yes, uh-huh.
24       Q    Who was the agency that you worked for?
25       A    Genesis Home Health.
```

1    Q   So it's a huge burden on your shoulders to

2  tell me to keep the communication open and that

3  we're understanding each other, because I'm relying

4  on what you tell me, okay?

5    A   Okay.

6    Q   All right.  With that, there are a couple

7  of housekeeping things that I'd like to get out of

8  the way right away.  The first thing I'd like to

9  ask you is if you recognize the document that I'm

10  placing in front of you.

11          (Whereupon, Defendant's Exhibit Number 1

12  was marked for identification.)

13    A   Yes.

14    Q   I'm sorry?

15    A   Yes.

16    Q   Okay.  And is this a copy of a

17  verification of your license as a licensed

18  practical nurse?

19    A   Yes.

20    Q   And is this the license that permitted you

21  to perform for Armor in the capacity as a licensed

22  practical nurse?

23    A   Yes.

24    Q   Is it still current today?

25    A   Yes.

1     Q    Are you working today as a licensed

2  practical nurse?

3     A    Yes.

4     Q    Where are you working?

5     A    I'm working for Jackson Memorial Hospital.

6     Q    How long have you been there?

7     A    Actually, I been there for like seven

8  years, but then they laid me off.  And they

9  recently called me back February, 2013.  So I've

10  been there for a year so far.

11     Q    Let me just ask you something about your

12  speech for a second.  Is English your first

13  language?

14     A    Yes.

15     Q    Okay.  Do you speak any other languages?

16     A    I speak Creole.

17     Q    Okay.  I don't detect any accent in

18  your -- The record can't hear this, okay.

19     A    Yes.

20     Q    But I don't detect any dialect at all in

21  your speech.  Do you detect a dialect, or have

22  people told you that you have a dialect?

23     A    No.

24     Q    Okay.  You speak English just as well as

25  --

1     A     Yes --

2     Q     You're fluent in -- just as well as

3    everybody else without any kind of dialect?

4     A     Yes.

5     Q     Okay.  All right.  I interrupted you.  So

6    you were called back February, 2013.  In what

7    position were you called back in?

8     A     As a L.P.N., licensed practical nurse.

9     Q     All right.  And when you were hired back

10   into that position, can you give me an idea of what

11   wage range you were hired into?

12    A     I was hired in Jackson making seven -- I

13   make twenty-three sixty-two.

14    Q     Is that now or is that then?

15    A     No.  This is now.

16    Q     Okay.  Were you hired into that same rate

17   when you were called back?

18    A     Yes.

19    Q     Okay.  So it hasn't changed?

20    A     No.

21    Q     Are you eligible to work overtime for

22   Jackson Memorial?

23    A     Yes.

24    Q     Do you take advantage of that?

25    A     Yes, I do.

```
 1      A     As a full-timer or as needed?

 2      Q     Well, I understood you never -- Well --

 3      A     As needed, no.

 4      Q     Okay.  What was the wage that you earned

 5   working per diem for Vitas?

 6      A     Nineteen.

 7      Q     Nineteen dollars?

 8      A     Yes.

 9      Q     Okay.  And just to make sure I'm clear on

10   this.  When you began working at Vitas, you were on

11   an as-needed basis and you never made any

12   particular requests to go regular full-time or to

13   increase the number of per diem hours; am I

14   correct?

15      A     Yeah.  You're correct.

16      Q     And the reason why you never did that has

17   to do with your desire to continue your schooling

18   program?

19      A     Yes.

20      Q     Okay.  All right.  Where were you born?

21      A     Miami, Florida.

22      Q     Okay.

23      A     I'm part Haitian and Cuban.

24      Q     All right.  You are actually a naturalized

25   citizen then?
```

```
 1      A    Yes.

 2      Q    Okay.  May I ask you why do you -- I've

 3  read your charge of discrimination, obviously.

 4      A    Yes.

 5      Q    And so I'm curious if you are born in the

 6  United States, why do you consider yourself to be

 7  of Haitian nationality?

 8      A    Because my -- both of my parents are

 9  Haitian.

10      Q    Okay.  All right.  Any other reason than

11  that?

12      A    No.

13      Q    Has Franceen Walker ever met your parents?

14      A    No.

15      Q    Has Lina ever met your parents?

16      A    No.

17      Q    Has --

18      A    Yusi.

19      Q    -- Yusi ever met your parents?

20      A    No.

21      Q    And, finally, has Ms. Davies ever met your

22  parents?

23      A    No.

24      Q    Okay.  We'll identify who those names are

25  later, but as long as we're on that issue I just
```

1    A    Yes.

2    Q    And L.P.N. is your handwriting, right?

3    A    Yes.

4    Q    And then there's a checkmark in P.T.  What

5    does that mean?

6    A    Part-time.

7    Q    Okay.  So you were applying for part-time

8    work?

9    A    Yes.  But when I applied for the part-

10   time, they didn't give me the part-time.  They gave

11   me per diem, as needed.  But then Yusi had got

12   short and offered me a full-time position, which

13   required thirty-two hours a week.  So I would work

14   Monday, Tuesday, Wednesday, Thursday and Friday,

15   Saturday and Sunday I was off.

16   Q    Okay.  I think I understand.  Let me -- I

17   think the first thing you're doing is

18   distinguishing part-time work from per diem; is

19   that right?

20   A    Yes.

21   Q    The way Armor does it, they have like a

22   category P6 and P8, which means that you work

23   either twenty-four hours in a week or thirty-two

24   hours in a week?

25   A    Yes.

1    Q    And that would be considered part-time?

2    A    No.  Full-time.

3    Q    Oh, that would be considered full-time?

4    A    Yes.  That was full-time for me.  Thirty-

5    two hours was full-time because I got their

6    benefit, full benefits.

7    Q    Okay.  I think I understand.  So when you

8    applied for part-time, you actually were placed in

9    a per diem position?

10    A    Yes.

11    Q    All right.  And was that satisfactory for

12    you?  Was that okay?

13    A    That was okay at that time.

14    Q    At that time, all right.

15          Then in reference to have you ever been

16    convicted or pled guilty, the handwriting the way

17    I'm reading it says -- I'm sorry.  Let me finish

18    that thought.

19          The question is have you ever been

20    convicted of, or pled guilty to a felony within the

21    past ten years.  And you've check marked no; is

22    that correct?

23    A    Yes.

24    Q    And then you have an explanation.  Is that

25    in your handwriting, the explanation?

1    Q    In general when you sign a document and

2    you date it, does that mean that you've actually

3    reviewed the document?

4    A    Yes.

5    Q    And the document is accurate to the best

6    of your knowledge?

7    A    Yes.

8    Q    And is that your practice throughout?

9    A    Yes.

10   Q    Not just with applications, but just

11   generally when you sign and date a document, you're

12   saying that this is, this is authenticate?

13   A    Yes.

14   Q    Okay.  I'm going to hand you Exhibit 3 to

15   your deposition.

16        (Whereupon, Defendant's Exhibit Number 3

17   was marked for identification.)

18   Q    Same exercise, Ms. Andre.  Do you

19   recognize Exhibit 3?

20   A    Yes.

21   Q    What is that document?

22   A    That's the pay rate, how much I will be

23   getting.

24   Q    More accurately, Ms. Andre, is this a form

25   that Armor uses to track changes in their

1    employees' employment?

2        A    Yes.

3        Q    Okay.  And they refer to these as

4    personnel action forms?

5        A    (Nods head.)

6             THE COURT REPORTER:  Yes?

7        A    Yes.

8        Q    The first box that I wanted to ask you is

9    a new hire.  So this is reflecting when you were

10   hired; is that right?

11       A    Yes.

12       Q    And it has an effective date of August 17,

13   2010?

14       A    Yes.

15       Q    And is that accurate?  Does that square

16   with your recollection?

17       A    Yes.

18       Q    If you go to ethnicity, there are several

19   boxes with initials by them.

20            Do you see that?

21       A    Yes.

22       Q    Can you go through those boxes and explain

23   what you perceived each one of those as being?

24       A    White for "W".  "B" for black.  "H" for

25   Hispanic, "A" for American.

1    Q   I'm guessing Asian, but maybe I'm wrong.

2    A   "A" -- Well, I don't know that.

3    Q   Okay.  Well, we're speculating on that

4  one, so I will take that out.  Okay.

5    A   And "P", I don't know about that.

6    Q   Okay.  Maybe island Pacific, or do we

7  know?  You don't know?

8    A   I don't know.

9    Q   Okay.  Which one is checked?

10   A   "B".

11   Q   Is that accurate?  Did you tell Armor

12  you're -- did you identify yourself as being black?

13   A   Yes.

14   Q   Okay.  Is there any form that's similar to

15  this one where you ever advised anyone at Armor

16  that you considered your nationality to be Haitian?

17   A   No.

18   Q   Okay.  And when you applied for

19  employment, are there certain eligibility -- like

20  naturalized citizen and citizen kind of forms that

21  you have to sign off on saying that you are a

22  citizen of the United States and you are

23  permitted --

24   A   Yes.

25   Q   -- to work here; is that correct?

1    A    Yes.

2    Q    Okay.  In those documents did you identify

3    yourself as an American citizen?

4    A    Yes.

5    Q    In any of those documents that you've ever

6    executed in any form for Armor, have you ever

7    indicated at all that you considered your

8    nationality to be Haitian?

9    A    No.

10   Q    We're foreshadowing a little bit, but I

11   just think it bears asking.  If there is no

12   document where you have identified yourself as

13   being Haitian to Armor --

14   A    Yes.

15   Q    -- if you are, if your speech, we talked

16   about it earlier in your deposition, if your speech

17   doesn't indicate any type of national origin,

18   how -- or do you think that your speech does

19   indicate national origin?

20   A    No.

21   Q    Okay.  How would anyone at Armor know your

22   national origin?

23   A    Because I speak the language when --

24   Because how they found out I was Haitian is it was

25   an employee that really didn't understand certain

1    things that she was being trained.  So in order for

2    her to understand properly what's going on, I was

3    translating in Creole to her.

4        Q    Okay.

5        A    And telling her this is what you need to

6    do, this is what you need to do, in Creole.

7        Q    Okay.  When did that occur?

8        A    I don't recall the exact date.

9        Q    Was there a time where Franceen Walker was

10   your immediate supervisor?

11       A    Yes.

12       Q    Okay.  Was there a time when

13   Franceen Walker ceased to be your immediate

14   supervisor?

15       A    Yes.

16       Q    Okay.  Was it before or after Ms. Walker

17   ceased to be your supervisor?

18            MR. PALUGYAL:  Object to the form.

19       A    Excuse me?

20            MR. PALUGYAL:  You can still answer

21       the question, I was just noting an

22       objection for the record.

23       Q    It was what?

24       A    It was -- I don't recall the -- It should

25   be while she was my supervisor.

```
 1    me.  Was it?  Or, I mean, do you --
 2        A    I have no idea.
 3        Q    Okay.  All right.  Any other instances?
 4        A    No.  That's it.
 5        Q    So let's talk about Sodna Paul.  Was
 6    anyone else present between -- other than the two
 7    of you when you spoke Creole to her?
 8        A    Yes.
 9        Q    Who else was present?
10        A    Nurse Walker used to be there, Nurse Cos,
11    Carolyn.
12        Q    Okay.  So you think that Nurse Walker
13    actually heard or observed you speak Creole to
14    other employees?
15        A    Yes.
16        Q    And you think that occurred during the
17    time she was your supervisor?
18        A    Yes.
19        Q    What about Lina, do you have any reason to
20    think that Lina would know that you have some
21    association with Haiti?
22        A    No.  Because I hardly see Lina.
23        Q    Okay.  What about Yusi?
24        A    Yusi, yes.
25        Q    Why do you think Yusi would be familiar
```

```
 1   with your association with Haiti?

 2        A    Because I told Yusi I was.

 3        Q    Okay.  Did you tell her in the context of

 4   making a complaint against Ms. Walker?

 5        A    No.

 6        Q    Other times you told her?

 7        A    Other times, because there's some

 8   patient -- like inmates that come in, if they don't

 9   know how to speak English or Creole -- I mean,

10   English, I would translate; hey, this is, this the

11   question they're asking you, so they could have a

12   good understanding what they're asking them so the

13   process could go.

14        Q    Okay.

15        A    So I would translate for the Haitian

16   people that come through there.

17        Q    Okay.  Do you know Vicki Davies?

18        A    No.  I met her only once, and that's when

19   she terminated me.

20             MS. CARVAJAL:  It's Karen.

21        Q    I'm sorry.

22        A    Karen, Karen Davies.

23        Q    That's why I look to her.  Karen Davies.

24             MR. PALUGYAL:  Oh, and could she

25        state her name for the record since now
```

```
 1      she's part of the --
 2          MS. CARVAJAL:  Yes.  My name is
 3      Carmen Carvajal.  H.R. Department,
 4      employee relations manager for Armor.
 5  BY MR. NOAH:
 6      Q    So you've met Karen Davies on one
 7  occasion?
 8      A    Yes.
 9      Q    So do you have any reason to think that
10  Karen Davis knew your nationality?
11      A    No.
12      Q    Have you ever met an employee at Armor by
13  the name of Ceran Rawls?
14      A    No.
15      Q    Do you know who that is?
16      A    No.
17      Q    Okay.  When -- At the time that you
18  believed that Yusi would have known that you were
19  Creole speaking, did that occur while you were
20  working under Nurse Walker's supervision?
21      A    Yes.
22          We done with this?
23      Q    Yes, ma'am.
24          All right.  I'm handing you Exhibit 4 to
25  your deposition.
```

```
 1                (Whereupon, Defendant's Exhibit Number 4
 2    was marked for identification.)
 3        Q    Do you recognize Exhibit 4?
 4        A    Yes.
 5        Q    What is that?
 6        A    That's the handbook that gives you all the
 7    detail of Armor Correction, the policy, the
 8    vacation time.  They give you all the breakdowns.
 9        Q    All right.  More accurately, is Exhibit 4
10    your acknowledgement of receiving those policies
11    that you've just described?
12        A    Yes.
13        Q    Okay.  You're jumping in on my question a
14    little bit.  And if I don't tell you, she will.
15        A    Okay.
16        Q    All right.  And, again, this is a document
17    that's signed and dated; is that right?
18        A    Yes.
19             MR. PALUGYAL:  Excuse me.  I
20        apologize for that.
21             Counsel, I believe that she was
22        answering a question earlier, since you
23        mentioned about interrupting, where I
24        think you cut her off where she was
25        listing names of persons who had heard her
```

1    Q    Going back to Exhibit 4 though, it has

2    your signature and date on it; is that correct?

3    A    Yes.

4    Q    Does that indicate to us that in fact you

5    did receive the policies and procedures --

6    A    Yes.

7    Q    -- on that date?

8    A    Yes.

9         (Whereupon, Defendant's Exhibit Number 5

10   was marked for identification.)

11   Q    Let me hand you Exhibit 5.  What is

12   Exhibit 5?

13   A    That's the handbook.

14   Q    All right.  And this is a copy of the

15   handbook that you received and that you

16   acknowledged receiving?

17   A    Yes.

18   Q    All right.  I had a couple questions I

19   wanted to ask you about this.

20        The first one is on pages 3 and 4.

21        Do you see a heading that refers to Equal

22   Employment Opportunity?

23   A    Yes.

24   Q    And does that set -- To your

25   understanding, does that set out Armor's policies

1    Q    Okay.  So was it your understanding of

2  this policy that it meant that an employee at Armor

3  could not discriminate against you either on

4  account of your race or your national origin?

5    A    Yes.

6    Q    And did you understand that national

7  origin meant Haitian?

8    A    Yes.

9    Q    What does that mean to an employer, when

10  an employer says that, employee, you cannot

11  discriminate?  What happens if that person

12  discriminates?  What should happen to that person?

13        MR. PALUGYAL:  Object to the form.

14    Q    Go ahead.

15        MR. PALUGYAL:  Okay.  Maybe I should

16        have --

17        You can always, and you should always

18        answer all of counsel's questions.

19    A    Yes.

20        MR. PALUGYAL:  I'm just noting an

21        objection for the record, but that's --

22        but you should still please always, unless

23        I instruct you specifically not to answer

24        a question, please always answer counsel's

25        questions, okay.

1    A    Okay.

2

3    BY MR. NOAH:

4    Q    All right.  So under the policy -- What's

5    supposed to happen under the policy if somebody

6    discriminates on those basis?

7    A    The employee could file a grievance or

8    report that individual that she feel like that

9    discriminated against her.

10   Q    And let's assume that Armor sustains that.

11   You know what that means?

12   A    Yes.

13   Q    They agree that there was discrimination.

14   A    Yes.

15   Q    Now, what happens to the person who

16   discriminated?  What should -- Under the policy,

17   what would happen to that person?

18   A    Termination.

19   Q    It could mean termination.

20   A    And, or some type of write-up or --

21   Q    Discipline?

22   A    Yeah.  Discipline.

23   Q    Can you think of anything else that Armor

24   could do to prohibit discrimination in the

25   workplace, other than threatening its employees

1    can feel harassed.

2      Q    And if somebody engages in harassment, are

3    the rules the same, they can be disciplined up to

4    discharge?

5      A    Yes.

6      Q    Does that seem like a reasonable policy to

7    you?

8      A    Yes.

9      Q    If you take a look at page 11.

10     A    Okay.

11     Q    You see a policy that governs overtime

12    pay?

13     A    Yes.

14     Q    All right.  And I'm just going to skip

15    down to the third full paragraph that begins

16    employees must.

17     A    Yes.

18     Q    You see that?

19     A    Yes.

20     Q    Just read along with me and make sure that

21    I'm reading this accurately.

22          Employees must obtain approval from their

23    immediate supervisors before working any overtime.

24    Unauthorized overtime will be paid but may be

25    grounds for corrective action.

```
 1            Have I read that accurately?

 2       A    Yes.

 3       Q    Okay.  What did you understand that policy

 4   to mean?

 5       A    That in order for you to work overtime,

 6   your supervisor has to give you permission to work.

 7       Q    Okay.  Is that a reasonable policy for an

 8   employer --

 9       A    Yes.

10       Q    -- to promulgate and to maintain?

11       A    Yes.

12       Q    And the next thing I wanted to ask you

13   about is on page 15.  Does 15 contain a policy that

14   governs personal days, paid time off?

15       A    Yes.

16       Q    All right.  And what I wanted to ask you

17   about that is the sixth full paragraph that begins,

18   employees must.

19            Do you see that?

20       A    That's page 13, right?

21       Q    Page 15.

22       A    Fifteen.  Okay.  Yes.

23       Q    All right.  Since you were on the wrong

24   page, I'm sorry, I just want to make sure that

25   we're clear.
```

1          Does page 15 contain a policy that governs

2    paid time off?

3        A    Yes.

4        Q    Okay.  Now, under that policy we're

5    looking at the sixth full paragraph that begins,

6    employees must, okay?

7        A    Yes.

8        Q    All right.  Just read along with me and

9    make sure I'm reading this accurately.

10          Employees must request their personal days

11    with as much notice as possible, at least five days

12    in advance to make sure that their request is

13    approved in writing by the supervisor, slash,

14    administrator, prior to taking the requested time

15    off.  Any absence not requested in advance will be

16    considered an unscheduled absence and may not be

17    paid.

18          Have I read that accurately?

19        A    Yes.

20        Q    What did you understand those two

21    sentences to mean?

22        A    That in order for you to have paid time

23    off, you have to give notice, like put -- turn in a

24    request form, which we fill out to get that date

25    off in advance.  And if you don't work, you don't

1  get paid.

2      Q    Does that seem like a reasonable policy

3  for Armor or any employer to promulgate?

4      A    Yes.

5      Q    Why do you consider that to be reasonable?

6      A    Because you have to turn in a request, or

7  else if they're short staffed, that means they have

8  to pull somebody else to work in your spot.

9      Q    All right.  So if somebody doesn't give

10 advance notice, it can create inefficiencies in the

11 scheduling?

12     A    Yes.

13     Q    Was it your understanding that Armor

14 worked under contract with the sheriff's

15 department?

16     A    Yes.

17     Q    And that those contracts provided specific

18 staffing requirements?

19     A    Yes.

20     Q    So in light of all of that, does that seem

21 like an important policy to you?

22     A    Yes.

23     Q    At least from the perspective of Armor

24 that would be an important policy to maintain?

25     A    Yes.

```
 1              MR. PALUGYAL:  Objection to form.
 2       Q    Let me ask it like this.
 3            Would that be an important policy for
 4    Armor to maintain?
 5       A    Yes.
 6       Q    I next wanted to ask you about page 18.
 7            All right.  Does page 18 contain a Family
 8    Medical Leave Act policy?
 9       A    Yes.
10       Q    All right.  And without going into detail,
11    I mean, can you tell me generally what your
12    understanding of that policy was while you worked
13    for Armor?
14       A    The family medical leave absence is when
15    you have a family member that's ill and you're
16    taking care of them.  That gives you -- that
17    protects your position, your job with Armor.
18       Q    Okay.
19       A    Where they can't fire you if you taking
20    care -- if you bring the proper documentation
21    stating that you have a family that's sick and you
22    need to take care of them.
23       Q    All right.  So let me discern better what
24    you said.  It sounds like what you're saying is
25    that if one of Armor's employees has a child that
```

1    the asthma attack while she's with me, I'm not

2    going to wait to drop my daughter off to her house

3    to get her treatment, I will take that

4    responsibility and do it myself.

5         Q    I understand you.  Then what you're saying

6    is that if the asthma attack occurs while you're

7    supervising your children, it may require you to

8    take an entire day off because you have to

9    administer and then you have to monitor and perhaps

10   administer again?

11        A    Yes.

12        Q    Okay.  And that's what creates the need

13   for leave off?

14        A    Yes.  And I just wanted to protect my job

15   just in case if something happen.

16        Q    Now, perhaps this is a silly question, but

17   each time that you were late, even if you received

18   discipline for it, you were never terminated as a

19   result of that, were you?

20        A    No.  But I was threatened.

21        Q    Threatened, all right.

22             I think those are all the questions I want

23   to ask you about family medical leave.

24             The next thing I wanted to ask you about

25   was on page 23.  Does page 23 contain a policy

```
 1   governing the Standards of Professional Conduct?

 2        A    Yes.

 3        Q    And did you understand that to mean that

 4   as an employee of Armor, Armor has certain

 5   expectations of the way that you will perform?

 6        A    Yes.

 7        Q    Okay.  And is this the section of the

 8   policies that govern their expectations of you?

 9        A    Yes.

10        Q    I'd like to ask you a couple questions

11   about this.  If you look at the last sentence of

12   the first paragraph, it begins employees; last

13   sentence, employees who fail.

14        A    Well, employee changing or --

15        Q    After Standards of Professional Conduct,

16   do you see that heading?

17        A    Every employee.

18        Q    No.  I'm looking at the last sentence of

19   that same paragraph, the last sentence begins

20   employees.

21        A    Okay.

22        Q    All right.  Just read along with me and

23   make sure that I'm reading this accurately.

24             Employees who fail to correct individual

25   deficiencies or who violate the Standards of
```

1    Professional Conduct will be subject to corrective

2    action, up to and including termination of

3    employment.

4              Have I read that accurately?

5      A    Yes.

6      Q    When you were an employee of Armor, what

7    did you understand that to mean?

8      A    That I have to perform my daily duties

9    correct.

10     Q    And according to these standards that

11   follow, right?

12     A    Yes.

13     Q    Okay.  And if you failed to do that, what

14   happened?

15     A    There's consequence.

16     Q    Is that reasonable for an employer to have

17   expectations of employees and apply consequences if

18   they don't --

19     A    Yes.

20     Q    -- comply?

21     A    Yes.

22     Q    That is reasonable?

23     A    Yes.

24     Q    And consequences, so that we're not

25   mincing terms, that means discipline, right?

1    A    Yes.

2    Q    And in this case it means discipline up to

3    and including termination?

4    A    Yes.

5    Q    Is that reasonable?

6    A    Yes.

7    Q    So there's a couple of these I wanted to

8    ask you about.  The first one off the bat is

9    reporting to work on time as scheduled.

10            Is that a reasonable code of conduct for

11    an employer to have?

12    A    Yes.

13    Q    Why do you think that's reasonable?  Same

14    reasons we talked about before, because there's

15    contractual requirements and there has to be

16    dependability and things of that nature?

17    A    Yes.

18    Q    Was there ever a time that you failed to

19    report to work on time or as scheduled that had

20    nothing to do with your daughter's asthma?

21    A    Yes.

22    Q    Okay.  The second one is to -- Just read

23    along with me and make sure that I'm reading it

24    accurately.

25            Notifying the supervisor in advance when

1    the employee will be absent from work or unable to

2    report for work on time.  Is that a reasonable code

3    of conduct to expect of employees?

4       A    Yes.

5       Q    For the same reasons we've already talked

6    about?

7       A    Yes.

8       Q    Number three, complying with all company

9    safety regulations.

10          Is that a reasonable policy?

11       A    Yes.

12       Q    Let me ask you as a generality, because as

13    a licensed practical nurse, did you administer any

14    type of medication?

15       A    Yes.

16       Q    Were any of those intravenous?

17       A    Injection.

18       Q    Injections, okay.

19          Does injection, does that mean that you

20    use syringes and needles and things of that nature?

21       A    Yes.

22       Q    Okay.  Is a used needle a danger if it's

23    not disposed of properly?

24       A    Yes.

25       Q    Okay.  And so if it's not disposed of

1    properly, could that be a safety regulation

2    violation?

3        A    Yes.

4        Q    Paragraph nine, maintaining workplace and

5    area cleanliness and orderliness.  What does that

6    mean?

7        A    To keep your area station organized.

8        Q    Okay.

9        A    And clean.

10        Q    In your estimation, would you be violating

11    a policy like that if used needles are left out?

12        A    Yes.

13        Q    Is that a reasonable policy for an

14    employer to have?

15        A    Yes.

16        Q    It's reasonable to expect their

17    employees -- nurses, particularly in this case --

18        A    Yes.

19        Q    -- to comply with things like that?

20        A    Yes.

21        Q    Number sixteen, following all corporate

22    office and facility policies, procedures and

23    directions.

24            Is that reasonable for an employer to

25    expect of its employees?

```
 1      A    Yes.

 2      Q    Okay.  I guess as a nurse in the medical

 3   field, there's probably pretty significant

 4   regulations that govern your practice, aren't

 5   there?

 6      A    Yes.

 7      Q    Such as like documenting medications and

 8   so forth is probably --

 9      A    Yes.

10      Q    -- pretty important?

11      A    Yes.

12      Q    If we -- What are some consequences that

13   could involve the patient -- could involve a

14   patient if those types of policies are not complied

15   with?

16      A    You could kill a patient like that.

17      Q    Okay.

18      A    Overdose them.

19      Q    So I guess you have -- We can agree that

20   Armor would consider a policy like that to be

21   pretty important?

22      A    Yes.

23      Q    Okay.  Because that's the business that

24   we're in?

25      A    Yes.
```

1      Q     Providing patient care, not killing them.

2  I don't mean to be facetious, I mean, I'm serious.

3  I mean, we are here to provide patient care, not to

4  do something that would harm them?

5      A     Yes.

6      Q     All right.  Then there is another section

7  that appears, and just read along with me and make

8  sure that I'm reading this full paragraph

9  accurately.

10           The company strictly prohibits the

11  following conduct and will subject the employee

12  involved to immediate disciplinary action, up to

13  and including termination of employment.  And then

14  it lists several examples; is that correct?

15      A     Yes.

16      Q     Okay.  Did you -- While you were an

17  employee, did you understand that to mean that now

18  if these things are engaged in, if it happens even

19  once, it could mean that you're going to be fired

20  from work?

21      A     Yes.

22      Q     Okay.  The first one I wanted to ask you

23  about is six.  Six prohibits insubordination or

24  refusing to follow management's instructions

25  concerning a job-related matter.

```
1              Is that reasonable to expect of employees?

2       A     Yes.

3       Q     Number seven is falsifying or altering

4   company records or reports, such as an employment

5   application, medical report, license or

6   certification, time record, expense report or

7   absentee report or patient records.

8              Is that a reasonable --

9       A     Yes.

10      Q     -- expectation of an employees?

11      A     Yes.

12      Q     Okay.  And this is going to the one issue

13  you were talking about.  Medical reports and

14  patient records are pretty important?

15      A     Yes.

16      Q     Okay.  Then it looks like eight is

17  similar.  Do you read it the same way that I do?

18      A     Which one is that, eight?

19      Q     Eight -- Is eight kind of similar to

20  seven?  It talks about falsifying or altering

21  documents, log books and things of that nature.

22      A     Yes.

23      Q     Okay.  Is that a reasonable expectation --

24      A     Yes.

25      Q     -- of employees?
```

1          Okay.  Then twelve, any act that

2    jeopardizes the security of the facility, the

3    health, safety or welfare of patients or staff or

4    any act or omission that is unresponsive to patient

5    needs.

6          Have I read that accurately?

7    A    Yes.

8    Q    Is that a reasonable expectation of a

9    licensed practical nurse?

10   A    Yes.

11   Q    Let me ask you about the -- You had

12   mentioned that for violations of certain policies

13   there are consequences.  In the case that we just

14   read last --

15   A    Yes.

16   Q    -- those instances, the consequence could

17   be termination on the first offense.  Did you read

18   it the same way?

19   A    Yes.

20   Q    Okay.  Now, does that consequence seem

21   consistent with the type of violations that they're

22   discussing there?

23   A    With Armor?

24   Q    Yes, ma'am.

25   A    No.

1     Q    You think that the consequence of

2   termination for falsifying a patient record, for

3   example, that that's too great of a consequence,

4   that shouldn't happen on the first offense?

5     A    They should give you a warning.

6     Q    Okay.

7     A    They give you a warning -- Well, actually

8   they give you a verbal warning, then they give you

9   a warning, then suspension and then termination if

10  you continue to do it.

11     Q    All right.

12     A    So they would let you know, hey, this is

13  what we find out and is it true; listen to your

14  side of the story.

15     Q    Okay.

16     A    So.

17     Q    Let me see if I understand what you've

18  just said.  I think what you're saying is that in

19  any case where any employee commits any

20  infraction --

21     A    Yes.

22     Q    -- there should always be a step procedure

23  where they are warned, they are suspended and then

24  they are terminated?

25     A    Yes.

Page 93

1   gave, even if you were the supervisor making the

2   rules that you thought were appropriate --

3       A    Yes.

4       Q    -- in the case that I explained, you would

5   still skip one of the progressive disciplines, you

6   would go straight to like suspension or treatment

7   or something like that?

8       A    Yes.  I will give -- Because that's way

9   serious.

10      Q    Okay.  So there are certain circumstances

11  where you understand that an employer, even you as

12  a supervisor --

13      A    Yes.

14      Q    If you were the supervisor, your judgment

15  would say, we have to go, we cannot follow the

16  routine step process, we have to jump to a more

17  serious discipline?

18      A    Yes.

19      Q    So -- And I appreciate you sharing your

20  view about how you would do it if you were the

21  supervisor.  But returning to Armor and how Armor's

22  policy reads --

23      A    Yes.

24      Q    -- you understand that Armor is saying in

25  this policy that if these infractions occur, there

1    A    Job description.

2    Q    More accurately, is it a job description

3    that you have signed --

4    A    Yes.

5    Q    -- that advises you of the essential

6    functions and different aspects of the position of

7    licensed practical nurse?

8    A    Yes.

9    Q    Okay.  So they're telling you this is what

10   we expect of you as a licensed practical nurse?

11   A    Yes.

12        (Whereupon, Defendant's Exhibit Number 7

13   was marked for identification.)

14   Q    This is Exhibit 7.  Exhibit 7 is another

15   personnel action form, isn't it, personnel action

16   form?

17   A    Yes.

18   Q    And this is indicating, it appears to me,

19   a transfer that you were going through that was

20   effective April 1st, 2011; is that right?

21   A    Yes.

22   Q    Okay.  What is going on here?  Is this

23   just transferring you from the P.R.N. status to

24   full-time?

25   A    Yes.

1    Q    Okay.

2    A    Full-time thirty-two.  It says it right

3  there.

4    Q    Okay.  Full-time.  This is like the P8

5  position we're talking about, your full-time,

6  thirty-two hours but you get benefits, even though

7  you're not working forty hours a week?

8    A    Yes.

9    Q    As of February 1, 2011 when you went full-

10  time thirty-two --

11    A    Yes.

12    Q    Okay.  Who was your immediate supervisor?

13    A    It was Franceen Walker, Nurse Bennett.

14    Q    Just a second.  So we go to Walker.  What

15  was her position?

16    A    Charge nurse.

17    Q    Okay.  Who did Ms. Walker report to?

18    A    To Yusi.

19    Q    What was Yusi's position?

20    A    She was the director of nursing, the

21  D.O.B.

22    Q    Who did Yusi report to?

23    A    Lina.

24    Q    And what was Lina's --

25    A    She was the H.S.A., health service

1    administrator.

2         Q    Okay.  So by Franceen, you mean

3    Franceen Walker; is that right?

4         A    Yeah.  I had two supervisors.  One is

5    Nurse Bennett.

6         Q    What was Nurse Bennett's position?

7         A    She was, she was a charge nurse when

8    Nurse Walker is not there.

9         Q    Okay.  And then do you remember Yusi's

10   last name?

11        A    It's start with A.L.  It's a difficult

12   name to pronounce.

13        Q    Okay.  What about Lina's last name?

14        A    Herra (sic).  It's H-E-R-R, I think "A",

15   if I'm not mistaken.

16        Q    Okay.  And is Yusi's last name, does this

17   sound right to you, it's spelled A-R-E-N-I-C-I-D --

18        A    Yes.

19        Q    I-A?

20        A    Yes.

21        Q    Okay.  So who did Ms. Herran report to?

22        A    I don't know after that.  Those are the

23   people that I knew about.

24        Q    All right.  What was Ms. Bennett's race --

25        A    Jamaican.

1    Q    -- if you know?

2    A    Jamaican.

3    Q    Jamaica to me sounds like a place where

4    she's from.  Do you know what her ethnicity was?

5    A    She was black.

6    Q    She's of African descent?

7    A    Yes.

8    Q    Okay.  And you think her nationality was

9    Jamaican?

10    A    Yes.

11    Q    Why do you think that?

12    A    She tells us.

13    Q    Oh, she told you?

14    A    Yeah.

15    Q    Okay.  What is Nurse Walker's ethnicity?

16    A    Black.

17    Q    What is her national origin?

18    A    Jamaican.

19    Q    How do you know that?

20    A    Because she tell us too.

21    Q    Okay.  What is Yusi's ethnicity?

22    A    White.

23    Q    What is her national origin?

24    A    I don't know.

25    Q    What is Lina Herran's ethnicity?

1    Q    And who did Yusi report to at the time of

2    your termination?

3    A    Lina?

4    Q    Was Lina still the H.S.A.?

5    A    Yes.

6    Q    All right.  So the H.S.A. that you worked

7    under during your entire employment was Lina?

8    A    Yes.

9    Q    Okay.  And then do you know who Lina

10   reported to at the time of your termination?

11   A    Well, the only reason I knew before I got

12   terminated who she reported to, because I called

13   corporate office, because we was supposed to sit

14   for a meeting.  I was supposed to sit for a meeting

15   with Yusi and Lina.  And I asked for someone from

16   the office, a representative to be there with me so

17   they won't say that I said something I didn't say.

18        But what she did -- what they did is

19   called Karen Davies.  And we had a phone

20   conference, 'cause she said she was in New York.

21   So she was not able to come to the meeting.

22   Q    Okay.  So you never actually met

23   Karen Davies face-to-face?

24   A    No, not till the day of termination.

25   Q    Okay.  Did you meet her at that time face-

1   to-face.

2       A    Yes.

3       Q    So she came from New York -- She was in

4   Miami when this occurred?

5       A    Yes.

6       Q    Which facility are we talking about?

7       A    Broward main jail; Fort Lauderdale.

8       Q    Okay.  Fort Lauderdale.  I'm sorry.

9            So from meeting Karen Davies, do you know

10  what her ethnicity is?

11      A    No.

12      Q    Okay.  Do you know what her nationality

13  is?

14      A    I didn't know anything about her.

15      Q    Okay.  When did -- Did you have any  -- So

16  the only, it looks to me like, the only supervisor

17  that changed between the time that you started

18  regular thirty-two hour full-time to the time of

19  your termination, is Nurse Walker, that

20  Nurse Joubert took her position?

21      A    Yes.

22      Q    Did you have any other charging nurses

23  during your employment, other than Walker or

24  Joubert?

25      A    They would have the L.P.N. when they don't

1    Q    Yusi?

2    A    No.

3    Q    Or Lina?

4    A    No.

5    Q    At the time -- Let's see.  Did your

6    transfer -- Just a second.

7         At the time of your termination, were you

8    still working as an L.P.N. thirty-two hours full-

9    time?

10   A    Yes.

11   Q    Okay.  So it never went to a forty-hour

12   shift?

13   A    No.

14        (Whereupon, Defendant's Exhibit Number 8

15   was marked for identification.)

16   Q    Let me hand you Exhibit Number 8.

17        Have you ever seen Exhibit Number 8

18   before?

19   A    I got to read it.  I don't recall that

20   one.

21   Q    Well, the first question is, do you

22   recognize what the document itself is?

23   A    Yes.

24   Q    What is it?

25   A    It's a write up.

1     Q    All right.  Well, the name of the

2   document, am I right, is a performance management

3   and conduct corrective action plan?

4     A    Yes.

5     Q    Is this a form that Armor typically used

6   in connection with coaching employees?

7     A    Yes.

8     Q    What is its purpose, to your

9   understanding?

10    A    To notify you what you did wrong and tell

11   you that you're getting written up.

12    Q    Okay.  And when you say that, to tell you

13   that you're getting written up, does this go to

14   what you were talking about before where you think

15   that the appropriate thing to do is to let somebody

16   know that they've done something wrong, explain why

17   you think it's wrong, give them an opportunity to

18   correct it?

19    A    I recall that I stated that they would

20   give you a verbal warning and then a written

21   warning, which is -- this is the written warning.

22    Q    Okay.  So you think there should be a step

23   before this?

24    A    Yes.

25    Q    Where there's like a --

```
 1      A     Yes.  Which is a verbal warning, which the

 2   person knows that, hey, you do this next time, then

 3   this will occur.

 4      Q     Okay.  But to the extent this is a written

 5   reprimand then --

 6      A     Yes.

 7      Q     -- if you prefer.

 8            Is that what a written reprimand does, it

 9   advises the person that they've done something

10   wrong, that Armor is not going to tolerate it

11   occurring again and so you need to correct this

12   behavior?

13      A     Yes.

14      Q     Okay.  That's the purpose of Exhibit 8?

15   That's what this does?

16      A     Uh-huh.

17      Q     Yes?

18      A     Yes.

19      Q     Now, it appears to me that your signature

20   is on this document.

21      A     Yes.

22      Q     Is that correct?

23      A     Yes.

24      Q     You do recognize that as being your

25   signature and the date that you received it?
```

```
 1      A     I don't recall the date.

 2      Q     Okay.

 3      A     The exact date.

 4      Q     How many times did she say words like that

 5   to you?

 6      A     Several times.

 7      Q     Okay.  During --

 8      A     But nothing ever happened.

 9      Q     In other words, you didn't -- There were

10   documents that you did not sign and you still

11   continued to work?

12      A     Yes.

13      Q     Okay.  So she's -- Your understanding was

14   she's telling you something that could occur, but

15   it did not occur, in fact during your entire

16   employment at Armor nobody ever fired you because

17   you failed to sign something?

18      A     Yes.

19      Q     Okay.  All right.  Well, returning to this

20   document, is there anything in the document

21   itself -- I understand that you don't remember it

22   and so forth, and if you don't, you don't.

23      A     Yes.

24      Q     So is there anything about the document

25   that gives you the impression that Nurse
```

1    Franceen Walker was involved in any way having

2    anything to do with this particular incident?

3       A    Not that I -- I don't recall that.

4       Q    So this is just between you and Yusi?

5       A    Yes.

6       Q    Okay.  Now, the date --

7       A    That's what it sound like, if it's about

8    meeting, because Nurse Walker don't deal with

9    meetings.

10      Q    Okay.  So Nurse Walker is not involved,

11   it's just you and Yusi?

12      A    Yes.

13      Q    All right.  So then I'm looking at a date

14   of August 17, 2010; is that right?

15      A    Yes.

16      Q    And you signed it --

17      A    No.  That's when I was hired.

18      Q    Oh, I'm sorry.  You're right.

19           I meant to -- The date that you signed

20   this document is May 6, 2011?

21      A    Yes.

22      Q    All right.  Up to that date, did you have

23   any reason to believe that Yusi -- Well, Strike

24   that.

25           Do you think that this was issued to you

1   because of your race?

2        A    No.

3        Q    Do you think it was issued to you because

4   of your nationality?

5        A    No.

6        Q    Up to May 6th, 2011, had Yusi given you

7   any impression that she harbors some sort of

8   animus?  Do you know what I mean by that word?

9        A    No.

10       Q    That she -- Well, first of all, do you

11   know what I mean by animus?

12       A    Yes.  Some type of --

13       Q    Hostility.

14       A    No, no.  Yusi was -- she was not like

15   that.

16       Q    Okay.

17       A    She was --

18       Q    Okay.

19       A    She will tell you, you know, this what

20   happened, this what happened.  But to hold anger

21   and stuff, she's not that type of person to hold

22   grudges.

23       Q    All right.  Well, I -- Then let me define

24   my terms a little bit better then, okay, because

25   this case -- lawsuits don't get filed over grudges.

1    They get filed over very specific things.

2        A    Okay.

3        Q    So let me make sure that I'm clear.  Let's

4    open it up in light of what you said.

5        A    Okay.

6        Q    During your entire employment with Armor,

7    did Yusi ever give you any indication that she

8    would discriminate against you because of your

9    race?

10       A    No.

11       Q    Did Yusi ever give you any indication that

12   she would discriminate against you because of your

13   nationality?

14       A    No.

15       Q    Did Yusi ever give you any indication that

16   she believed in certain stereotypes based on race?

17       A    No.

18       Q    Did she give you any indication that she

19   believed in stereotypes based on nationality?

20       A    No.

21       Q    Or being Haitian?  When I say nationality,

22   I'm talking about being Haitian.

23       A    No.

24       Q    All right.  Let's talk about Lina.  During

25   your entire employment at Armor, did Lina ever give

1    you any indication that she would discriminate

2    against you because of your race?

3        A    No.

4        Q    Did Lina give you any indication that she

5    would discriminate against you because your Haitian

6    association?

7        A    No.

8        Q    Did Lina ever say anything or engage in

9    conduct that led you to believe that she harbored

10   stereotypes based on race?

11       A    No.

12       Q    Did she give you any indication that she

13   harbored stereotypes based on being Haitian?

14       A    No.

15       Q    Okay.  Ms. Davies -- I'm not going to ask

16   you about her, because you don't know her at all.

17       A    I don't know her.

18       Q    If she discriminates you wouldn't have any

19   way of knowing one way or the other?

20       A    Because I only met her once, that's it.

21       Q    And you wouldn't have any factual basis

22   for suspecting that she would discriminate against

23   you?

24       A    I don't know her, so I can't really say

25   anything about her.